FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JANELLE PEREZ,
          *Plaintiff-Appellant*,

                    v.

CITY OF ROSEVILLE; ROSEVILLE
POLICE DEPARTMENT; STEPHAN
MOORE, Captain; DANIEL HAHN,
Chief; CAL WALSTAD, Lieutenant,
          *Defendants-Appellees.*

No. 15-16430

D.C. No.
2:13-cv-02150-
GEB-DAD

ORDER AND
OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, Jr., District Judge, Presiding

Argued and Submitted April 19, 2017
San Francisco, California

Filed May 21, 2019

Before:  A. Wallace Tashima and Sandra S. Ikuta,[*] Circuit Judges, and Donald W. Molloy,[**] District Judge.

Opinion by Judge Ikuta;
Dissent by Judge Molloy

**SUMMARY**[***]

**Employment Discrimination / Constitutional Law**

The panel filed (1) an order withdrawing the opinion and concurring opinion filed on February 9, 2018, and ruling that a sua sponte en banc call and a motion for attorneys' fees were moot; and (2) a new opinion and dissenting opinion.

In the new opinion, the panel affirmed the district court's summary judgment in favor of the defendants on a former City of Roseville probationary police officer's claims under 42 U.S.C. § 1983 for (1) violation of her rights to privacy and intimate association under the First, Fourth, and Fourteenth Amendments; and (2) deprivation of liberty

---

[*] Judge Reinhardt, who was originally a member of this panel, died after this case was argued and the original opinion was issued. Pursuant to Ninth Circuit General Order 3.2(h), Judge Ikuta was randomly drawn to replace him. Judge Ikuta has read the briefs, reviewed the record, and watched video recordings of the oral arguments.

[**] The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

without due process of law in violation of the Fourteenth Amendment.

The panel held that the individual defendants were entitled to qualified immunity on the first claim because it was not clearly established that a probationary officer's constitutional rights to privacy and intimate association are violated if a police department terminates her due to participation in an ongoing extramarital relationship with a married officer with whom she worked, where an internal affairs investigation found that the probationary officer engaged in inappropriate personal cell phone use in connection with the relationship while on duty, resulting in a written reprimand for violating department policy.

It also was not clearly established that there was a legally sufficient temporal nexus between the individual defendants' allegedly stigmatizing statements and the probationary officer's termination. The individual defendants were therefore also entitled to qualified immunity on the probationary officer's claim that the lack of a name-clearing hearing violated her due process rights.

The plaintiff also appealed the district court's summary judgment on her claims against the City of Roseville, and the Roseville Police Department for sex discrimination in violation of Title VII and the California Fair Employment and Housing Act, but she conceded that the alleged discrimination was not actually based on her gender. Accordingly, the panel affirmed the district court.

The majority rejected the dissent's argument that it was improper to substitute a different judge following the post-publication death of the original decision's author and to change a previously published opinion except as part of an

en banc decision. The majority wrote that *Carver v. Lehman*, 558 F.3d 869 (9th Cir. 2009), is directly applicable here. The majority explained that because the opinion issued by the prior majority was only part way through its finalization process, a replacement judge was drawn, en banc proceedings were suspended, and the new panel had the authority to reconsider and withdraw the opinion filed by the prior panel and to substitute a different opinion.

Dissenting, District Judge Molloy wrote that the majority in the prior published opinion, *Perez v City of Roseville*, 882 F.3d 843 (9th Cir. 2018), correctly resolved the issues, and the majority opinion of a quorum of judges should stand for the reasons stated therein. District Judge Molloy wrote that the substitution of a judge who legitimately disagrees with the original opinion should not change the outcome except as part of an en banc court decision.

## COUNSEL

Richard P. Fisher (argued), Goyette & Associates Inc., Gold River, California, for Plaintiff-Appellant.

Stacey N. Sheston (argued) and Laura J. Fowler, Best Best & Krieger LLP, Sacramento, California, for Defendants-Appellees.

## ORDER

The opinion and concurring opinion filed February 9, 2018, and appearing at 882 F.3d 843 (9th Cir. 2018), are withdrawn. They may not be cited by or to this court or any district court of the Ninth Circuit. The sua sponte en banc call is therefore moot.

A new opinion is filed simultaneously with the filing of this order, along with a dissenting opinion. The parties may file petitions for rehearing and petitions for rehearing en banc in response to the new opinion, as allowed by the Federal Rules of Appellate Procedure.

Appellant's motion for attorneys' fees is **DENIED** as moot.

## OPINION

IKUTA, Circuit Judge:

Janelle Perez, a former probationary police officer employed by the Roseville Police Department ("the Department"), appeals the district court's summary judgment in favor of Chief Daniel Hahn, Captain Stefan Moore, and Lieutenant Cal Walstad (collectively, "individual defendants") on her claims against them under 42 U.S.C. § 1983 for (1) violation of her rights to privacy and intimate association under the First, Fourth, and Fourteenth Amendments; and (2) deprivation of liberty without due process of law in violation of the Fourteenth Amendment. We conclude that the individual defendants are entitled to qualified immunity on Perez's first claim because it is not clearly established that a probationary

officer's constitutional rights to privacy and intimate association are violated if a police department terminates her due to her participation in an ongoing extramarital relationship with a married officer with whom she worked, where an internal affairs investigation found that the probationary officer engaged in inappropriate personal cell phone use in connection with the relationship while she was on duty, resulting in a written reprimand for violating department policy. Our precedent also does not clearly establish that there was a legally sufficient temporal nexus between the individual defendants' allegedly stigmatizing statements and Perez's termination, and the individual defendants are therefore also entitled to qualified immunity on Perez's claim that the lack of a name-clearing hearing violated her due process rights. Finally, while Perez also appealed the district court's summary judgment on her claims against the individual defendants, the City of Roseville, and the Department for sex discrimination in violation of Title VII of the Civil Rights Act of 1964 and the California Fair Employment and Housing Act, she conceded that the alleged discrimination was not actually based on her gender. Accordingly, we affirm the district court.

I

In 2011, Perez applied for a position as a police officer with the City of Roseville Police Department. Perez had previously worked as a police officer for the City of South Francisco. Captain Stefan Moore interviewed Perez and recommended that she be hired.[1]

---

[1] Because this appeal arises from the district court's grant of defendants' motion for summary judgment, we view the facts in the light

The Department conducted the customary investigation into Perez's background. Based on that background check, Chief Daniel Hahn learned that Perez had experienced conflicts with some female officers in her past job. Nevertheless, Chief Hahn decided to hire Perez for the typical one-year probationary period for new hires and sent her a letter confirming her employment. The letter stated that "[d]uring [her] probationary period [Perez] may be released from City services with or without cause at the sole discretion of the City."

Perez began her one-year probationary term on January 9, 2012. She spent the first ten weeks completing field training. Shortly after being released from the field training program, Perez separated from her husband. She began dating Shad Begley, another officer in the Department, who also separated from his spouse shortly after he began working the same shift as Perez.

On June 6, 2012, Chief Hahn received a written citizen's complaint from Leah Begley, Shad Begley's wife. She alleged that Begley and Perez were having an extramarital relationship and suggested that they were engaging in romantic relations while on duty. Leah Begley also alleged that her husband and Perez were engaging in numerous phone and text contacts while on duty.

In accordance with Department policy on responding to citizen complaints, Chief Hahn instructed Lieutenant Troy Bergstrom to conduct an internal affairs investigation into the complaint. Lieutenant Bergstrom determined that two of the policy standards in section 340 of the Department policy

---

most favorable to Perez, the nonmoving party. *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1013 (9th Cir. 2018).

manual were potentially relevant. First, the allegation that Perez and Begley spent excessive time phoning and texting each other while on duty could constitute "[u]nsatisfactory work performance including, but not limited to, failure, incompetence, inefficiency or delay in performing and/or carrying out proper orders, work assignments or instructions of supervisors without a reasonable and bona fide excuse," in violation of section 340.3.5(c) of the manual. Second, the allegation that Perez and Begley engaged in personal relations while on duty could constitute "[a]ny other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members," in violation of section 340.3.5(aa) of the manual.

After conducting his investigation, which included interviewing Begley and Perez, as well as their spouses, and reviewing phone and text logs, Bergstrom prepared a detailed report. He found no evidence that Perez and Begley engaged in sexual relations while they were on duty. However, Bergstrom found that Perez and Begley made personal phone calls to each other on six different days in May 2012 while one or both were on duty. During each of these six days, Perez spent an average of 18 minutes per shift on personal phone calls with Begley. On May 20, 2012, Perez and Begley made seven personal phone calls to each other spanning 43 minutes of their 11-hour shifts. Three of those May 20 calls were made while Perez was responding to calls for help. Both officers admitted to sending personal text messages to each other while on duty. Perez stated that they typically sent personal texts to each other about five times per shift.

Bergstrom provided his report to Captain Stefan Moore, who was responsible for determining whether disciplinary action should be taken. Captain Moore asked Lieutenant Cal Walstad (Perez's and Begley's supervisor) to review the report and make a recommendation.

In a memo dated July 10, 2012, Walstad recommended that the charges against Perez be sustained. First, Walstad concluded that Perez violated the "[u]nsatisfactory work performance" standard set forth in section 340.3.5(c) of the manual because her personal calls impacted her ability to perform her duties. Walstad noted evidence that Perez talked on the phone to Begley while en route to dispatch calls, continued talking to him after she arrived on the scene of a disturbance, and also called Begley before reporting to headquarters to clear a call. Second, Walstad concluded that Perez had engaged in conduct "which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members," in violation of section 340.3.5(aa). Walstad concluded that "[t]he mutual relationship between Officers Perez and Begley is unprofessional." Due to its "secret" nature it "reflect[ed] unfavorably upon the Roseville Police Department and its members." Walstad stated that "[b]oth officers are married and have young children," and their relationship did not meet the "high standards of ethical conduct and behavior" required to "build and maintain morale, a sense of duty, effective standards of performance and community support." Walstad also recommended sustaining both disciplinary charges against Begley. Finally, he stated that he "would have expected Officers Begley and Perez to notify their Sergeant and or Lieutenant to advise they are involved in a

personal relationship so they could be assigned to different patrol shifts."

Captain Moore agreed that Perez and Begley violated the two policy standards.  On August 15, 2012, Captain Moore informed Perez and Begley that the internal investigation had resulted in sustaining the charges of "Unsatisfactory Work Performance" under section 340.3.5(c) and "Conduct Unbecoming" under section 340.3.5(aa).  The following day, August 16, 2012, the Department sent a letter to Leah Begley stating:

> The Roseville Police Department has completed its inquiry into the personnel complaint you filed alleging your husband and a co-worker were engaged in a personal relationship while on-duty.

> The following findings have been made as a result of the investigation:

> • Unsatisfactory work performance – SUSTAINED

> • Conduct unbecoming – SUSTAINED.

Because it was customary to terminate an employee who violates Department policies while on probation, Moore recommended that Perez be released from service (i.e., terminated).  Chief Hahn disagreed with Moore's recommendation and decided that a written reprimand to both Perez and Begley was sufficient.  Therefore, on August 23, 2012, Moore issued separate written reprimands to Perez and Begley explaining the grounds for the two violations.  In the reprimand to Perez, Moore first stated that it was

Department policy that officers could not engage in conduct that interfered with their ability to perform their jobs efficiently, including making personal telephone calls while on duty. The following incidents stood out as "clear policy violations": (1) a nineteen-minute call while Perez was supposed to be responding to a noise complaint; (2) an eight-minute call after Perez had been dispatched to a suicide subject call; (3) an eight-minute call while Perez was supposed to be conducting an area check for a suspicious vehicle; (4) a thirteen-minute call while Perez was supposed to be on foot patrol; and (5) a three-minute call while Perez was supposed to be taking a vandalism report.

Second, Moore stated that "[p]ersonal relationships that are established or maintained while you are off-duty should not impact the Roseville Police Department in a way that is contrary to good order, efficiency or morale and should not tend to reflect unfavorably upon the Department or its members." The reprimand stated that Perez had "failed to keep [her] relationship with Officer Shad Begley, a married co-worker, separate from [her] employment, as evidenced by the previously mentioned phone usage that you both admit was personal in nature." The personal phone usage "was inefficient, contrary to good order and ultimately reflected negatively on the Department." The reprimand concluded by stating that further conduct would result in further discipline, "which may be up to and including termination of your employment."

Perez and Begley both appealed their written reprimands, which entitled them to an administrative hearing before Chief Hahn. Perez's hearing was scheduled for September 4, 2012. While the appeal was pending, Perez and Begley continued their personal relationship but

concealed it from the Department for fear of further discipline.

Chief Hahn testified that sometime after Walstad's investigation but before the administrative hearing, he received negative comments about Perez's job performance from several different sources. First, Lieutenant Maria Richardson told him "that some of the Department's female officers had raised concerns about Perez' attitude and poor communications with them." Chief Hahn "recalled there being similar issues of concern from Perez' background investigation report regarding her relationship with female officers at her old department." Second, Chief Hahn learned from Lieutenant Bergstrom of a citizen complaint made against Perez that had been submitted via the Department's online "complaint or concern" system on August 13, 2012. According to the written complaint, the complainant had called the Department for assistance in response to a domestic violence incident. In the complainant's view, Officer Perez, who responded to the call, conducted the interview "in a very hostile and un-sympathetic manner" which left the complainant "emotionally distraught and badgered." After the complaint was referred to the watch commander for followup, the complainant declined to pursue a formal investigation. Finally, Chief Hahn testified that he learned from Sgt. Kelby Newton that on August 30, 2012, Perez had shown a bad attitude on the phone when Newton called her to inquire about when she was going to work a shift she had informally traded with Begley. According to Newton, Perez had told him it was none of the Department's business. Chief Hahn asked Newton to document this conversation in a memo.

Chief Hahn stated that although he had initially disagreed with Moore's recommendation to terminate Perez,

he understood that it was best practice "to release someone from probation rather than to impose lower level discipline where low-level misconduct has been determined to have occurred." According to Chief Hahn, he decided, shortly after his conversation with Newton, to release Perez from probation "based on all the new issues of concern" he had recently learned from Newton, Lieutenant Richardson, and Lieutenant Bergstrom. He later testified that one of the factors in his decision was that Perez had made personal telephone calls while on duty in a manner that impacted her ability to efficiently perform her job while responding to calls for service, as reflected in the findings of the internal affairs investigation, although that issue, standing alone, would not have caused him to terminate Perez. He explained that "[m]aking personal calls during work time and during performance of various work duties was a concern, but not one warranting termination." Chief Hahn confirmed that "the fact that [Perez] was involved in a relationship with Officer Begley and one or both of them were married at the time" played no role in his decision to fire her.

Chief Hahn's decision to terminate Perez did not affect her right to an administrative appeal regarding her written reprimand, and the hearing took place as scheduled on September 4, 2012. At the end of the hearing, Chief Hahn informed Perez that the Department was terminating her for failing to complete probation successfully, and gave her written notice of her release from service. The notice did not provide reasons for her termination; rather, it stated that, pursuant to Department policy, probationary officers could be released without cause.

Based on the evidence and testimony presented at the administrative hearing, Chief Hahn concluded that only a reprimand for violating the Department's phone policies

should be sustained.  He therefore ordered that the previously issued reprimand memos be revised to eliminate the reprimands for "unsatisfactory work performance" and "conduct unbecoming."  The revised reprimands for Begley and Perez were issued on September 10, 2012, and the earlier memos were removed from their files.

Perez filed this action for damages after her termination. The district court granted summary judgment in favor of the defendants on all claims, and Perez timely appealed.  We have jurisdiction under 28 U.S.C. § 1291 and review the district court's grant of summary judgment de novo. *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1013 (9th Cir. 2018).

## II

We first consider whether defendants were entitled to summary judgment on Perez's § 1983 claim that defendants terminated her based on her extramarital relationship with Begley, violating her constitutional right to privacy and intimate association.

## A

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).  Under the doctrine of qualified immunity, "courts may not award damages against a government official in his personal capacity unless the official violated a statutory or constitutional right, and the right was clearly established at the time of the challenged conduct."  *Lane v. Franks*, 573 U.S. 228, 243 (2014)

(internal quotation marks omitted). Accordingly, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* (internal quotation marks omitted). In applying this doctrine, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In addressing the second prong of the qualified immunity test—whether there is a violation of clearly established law—courts "do[] not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Further, the Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Id.* (quoting *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015)). Rather, the clearly established law at issue "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The contours of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 138 S. Ct. at 1153. In short, the doctrine is broad; it protects "all but the plainly incompetent or those who knowingly violate the law." *Pauly*, 137 S. Ct. at 551.

B

On appeal, Perez contends that the district court erred in granting summary judgment because there is sufficient evidence to create a triable issue of material fact as to

whether Chief Hahn impermissibly based his decision to terminate her, at least in part, on her private relationship with Begley, in violation of her constitutional rights. But even assuming that Perez could establish at trial that she was fired, at least in part, because of her extramarital relationship with Begley, defendants are entitled to summary judgment under the second prong of the qualified immunity test, unless it is clearly established that a police department cannot constitutionally terminate a probationary officer due to an ongoing extramarital relationship with a married officer with whom she worked, where an internal affairs investigation found that the probationary officer engaged in inappropriate personal cell phone use in connection with the relationship while she was on duty, resulting in a written reprimand for violating department policy. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

In arguing that such a rule is clearly established, Perez relies on our decision in *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir. 1983). *Thorne* involved a clerk-typist in a police department who applied to become a police officer. *Id.* at 462. The examination consisted of written and oral tests, followed by psychological and polygraph testing and a background investigation. *Id.* Before taking the polygraph test, the applicant reported on a questionnaire that she had been pregnant and had suffered a miscarriage. *Id.* The polygraph operator questioned her about this information and asked her to disclose the name of the child's father. *Id.* Pressed by the polygraph operator, the applicant ultimately disclosed that the father was a married officer in the police department. *Id.* Although the applicant asked for this information to be kept confidential, it was disclosed to several members of the department who were considering her application. *Id.* The applicant was ultimately not hired to be an officer. *Id.* at 463.

In her lawsuit against the city and other defendants, the applicant claimed that the department violated her constitutional right to privacy and intimate association "by forcing her to disclose information regarding personal sexual matters" and by refusing "to hire her as a police officer based in part on her prior sexual activities." *Id.* at 468. In analyzing these claims, *Thorne* held that it would violate an applicant's constitutional right to privacy to be refused employment because of her sexual activities where there was no evidence "that would show that appellant's affair with the police officer before becoming a police officer [candidate], herself, affected or could potentially affect her job performance." *Id.* at 469, 471. Thus, *Thorne* established that the state could not rely on "private non-job-related considerations," such as an applicant's prior sexual history, in rejecting an applicant for employment unless there is a showing "that private, off-duty, personal activities of the type protected by the constitutional guarantees of privacy and free association have an impact upon an applicant's on-the-job performance." *Id*. at 471.

*Thorne* explicitly rejected a per se rule that a police department can never consider its employees' sexual relations. *Id.* at 470. Rather, *Thorne* provided guidance regarding when such considerations are permissible and when they could violate an employee's constitutional rights. Among other things, *Thorne* acknowledged that it "may be true" that "[s]exual relations among officers in a paramilitary organization such as a police department are an appropriate matter of inquiry with respect to employment in light of their possible adverse effect on morale, assignments, and the command-subordinate relationship."[2]    *Id.* at 469. By

---

[2] *Thorne* nonetheless held that any information that may be collected about sexual relations of the type protected under the constitutional

contrast, a police department could not inquire about or consider an applicant's past sexual history that was irrelevant to on-the-job considerations. *Id.* at 471. For instance, the polygraph examiner in *Thorne* "was quite clearly concerned with whether [the applicant] had had an abortion, a matter totally irrelevant to 'on-the-job sex.'" *Id.* at 469–70. Nor was the applicant's wholly past relationship relevant to other factors of legitimate concern to a police department. Among other things, "[t]he affair was not a matter of public knowledge, and could not therefore diminish the department's reputation in the community." *Id.* at 471. Moreover, "[t]here was no reason to believe [the applicant] would engage in such affairs while on duty, or that the affair which had ended was likely to revive or cause morale problems within the department." *Id.* Finally, under the department's policies, the applicant's "conduct would not be a ground for discipline of a police officer, nor had any disciplinary measures against the officer involved been

---

guarantees of privacy and free association in the course of such an inquiry can be relied upon only in rejecting a candidate for employment if there is some showing that the relations affect on-the-job performance or violate a constitutionally permissible, narrowly tailored regulation. *See Thorne*, 726 F.2d at 470 ("We do not hold that the City is prohibited by the constitution from questioning or considering the morality of its employees. If the City chooses to regulate its employees in this area or to set standards for job applicants it may do so *only* through regulations carefully tailored to meet the City's specified needs." (emphasis added)); *see also id.* at 471 ("Even had the questions in this case been permissible, the use of the information in the decision to disqualify Thorne was not. . . . In the absence of any showing that private, off-duty, personal activities of the type protected by the constitutional guarantees of privacy and free association have an impact upon an applicant's on-the-job performance [or violate] specific policies with narrow implementing regulations, . . . reliance on these private non-job-related considerations by the state in rejecting an applicant for employment violates the applicant's protected constitutional interests . . . .").

attempted." *Id*. Indeed, the defendants in *Thorne* "never attempted to introduce evidence that would show that appellant's affair with a police officer before becoming a police officer, herself, affected or could potentially affect her job performance." *Id.*

In sum, *Thorne* held that a police department may not make employment decisions based on sexual activities that are wholly irrelevant to a police department's legitimate concerns about the employee's work performance. But *Thorne* did not preclude consideration of relationships that occurred on duty, or relationships among officers that were ongoing and affected on-the-job performance or other legitimate interests of the Department such as community reputation and morale. *Id.* at 469, 471. Nor did it deal with probationary officers. Therefore, *Thorne* does not put beyond debate the question whether a police department can fire a probationary officer who is engaged in an ongoing relationship with another married officer and routinely makes personal calls and texts to that officer while she is supposed to be responding to calls for help, giving rise to legitimate concerns regarding efficiency, morale, and public perception.

Nor have our subsequent cases expanded *Thorne*'s protections. Instead, they have indicated that, under *Thorne*'s holding, police departments can appropriately consider on-the-job sexual relations that impact job performance and are not purely private. *See Fugate v. Phx. Civil Serv. Bd.*, 791 F.2d 736, 741 (9th Cir. 1986). In *Fugate*, we considered whether two vice officers could be disciplined for "conduct unbecoming an officer and contrary to the general orders of the police department." *Id.* at 738. The police officers had engaged in sexual relations with prostitutes while on duty, and these relations were known to

the public. *Id.* at 737. The officers claimed that the department had "violated their constitutional right of privacy by punishing them for their private sexual activities." *Id.* at 738. In concluding that the department had not violated the officers' constitutional rights, *Fugate* distinguished *Thorne*, noting:

> In the present case we confront police officers who engaged in sexual relations while on the job. In *Thorne*, the City made no showing that Thorne's sexual activities "affected or could potentially affect her job performance." In the present case, the City has demonstrated that Appellants' job performance was threatened by obvious conflicts of interest as well as by the possibility of blackmail. In *Thorne*, the sexual activities in question were "not a matter of public knowledge, and could not therefore diminish the department's reputation in the community . . . or cause morale problems within the department." In the present case, the officers' sexual activities were carried on openly and were widely known.

*Id.* at 741 (quoting *Thorne*, 726 F.2d at 471). The Court further found that there was "no doubt that [the officers] behaved in a manner which threatened the department's legitimate interests." *Id.* at 742. After noting these distinctions, *Fugate* held that *Thorne*'s protections did not extend "to sexual behavior that is not purely private, that compromises a police officer's performance, and that threatens to undermine a police department's internal morale and community reputation." *Id.* at 741.

In sum, rather than delineate any bright line rule regarding the scope of *Thorne*'s protections, we carefully refrained from deciding "the exact limits of the right of privacy in sexual activities recognized in *Thorne*." *Id.* at 741 n.6.

In a subsequent case, *Fleisher v. City of Signal Hill*, 829 F.2d 1491 (9th Cir. 1987), we similarly held that "under our decisions in *Thorne* and *Fugate*," a police department could fire a probationary officer over sexual conduct that occurred before he was hired by the department, but which amounted to "criminal sexual misconduct," "compromised [the probationary officer's] performance as an aspiring police officer," "threatened to undermine the Department's community reputation and internal morale," and "was clearly listed in the Department regulations as grounds for termination." *Id.* at 1498–99.  In that case, the department determined that the probationary officer had sexual relations with his girlfriend when he was 19 and she was 15, in violation of California's statutory rape law. *Id*. at 1492–93, 1495.  At the time of this statutory rape, Fleisher was the volunteer leader of the police department's Explorer program, which was "designed to prepare youngsters for careers in law enforcement" through volunteer work for the department, and the minor girl with whom he had sexual relations was also a member of the Explorer program. *Id.* at 1492, 1499.  As a result, we rejected the officer's argument that the investigation into his prior off-duty sexual relationship violated his constitutional right to privacy. Specifically, we took it as "understandable that the Department would be concerned that individuals hired to be guardians of the law should themselves have a history of compliance with the law," and found it appropriate for the department to consider harm to its reputation and internal morale that would result from hiring such an officer. *Id*. at

1499.  In short, *Fleisher* permits consideration of some off-duty sexual conduct.

Applying the Supreme Court's standard, we conclude that these precedents are not so clear that every reasonable official would understand that terminating Perez because of her ongoing extramarital relationship with Begley violated her constitutional right to privacy, given the evidence that the relationship caused Perez to engage in inappropriate personal cell phone use while on the job in violation of departmental policy.  Unlike the situation in *Thorne*, Perez's conduct did not involve wholly past sexual relations that had no relevance to on-the-job performance or other factors of legitimate concern to a police department.  Rather, in this case an internal affairs investigation resulted in a report with specific and detailed findings that Perez used her personal cell phone to call and text Begley while on duty, including while driving her police vehicle and responding to calls for service.  As a result of this personal phone usage, Perez was issued a written reprimand that tied the phone usage to her relationship with Begley and concluded that the phone usage entailed "clear policy violations" and was "inefficient, contrary to good order[,] and ultimately reflected negatively on the Department."[3]  In contrast, in *Thorne*, we noted that the defendants had "never attempted to introduce evidence that would show that [Thorne's wholly past sexual relationship] affected or could potentially affect her job performance," and that "Thorne's conduct would not be a

---

[3] Although Chief Hahn ultimately decided, after the administrative appeal hearing, that the original written reprimand charging Perez with "unsatisfactory work performance" and "conduct unbecoming" should be rescinded, he never disputed the findings about the underlying phone conduct, and he in fact concluded that those findings supported a reprimand for violation of the department's personal communication devices policy.

ground for discipline of a police officer, nor had any disciplinary measures against the officer involved been attempted." 726 F.2d at 471. As a result, our precedents do not clearly establish that a police department is constitutionally prohibited from considering an officer's off-duty sexual relationship in making a decision to terminate her, where there is specific evidence that the officer engaged in on-the-job conduct in connection with that relationship that violated departmental policy. *See id.* (holding that reliance on "private, off-duty, personal activities of the type protected by the constitutional guarantees of privacy and free association" in rejecting a person for employment is constitutionally prohibited unless there is "*any* showing" that such activities "have an impact upon . . . on-the-job performance" (emphasis added)). Accordingly, we affirm the district court's grant of summary judgment to defendants on this claim.[4]

## III

We next consider whether defendants were entitled to summary judgment on Perez's § 1983 claim that defendants violated her constitutional right to due process by failing to give her an adequate opportunity to refute the charges made against her and clear her name before she was terminated.

---

[4] Perez's complaint also claimed that her termination was due to gender discrimination in violation of Title VII of the Civil Rights Act of 1964 and California's Fair Employment and Housing Act. But she argued on appeal that the gender-related discriminatory conduct she experienced was based solely on her having a relationship with another officer, a ground for discharge that violated her rights to privacy and intimate association. In view of Perez's concession, we affirm the grant of summary judgment on these claims.

When a public employee is terminated for reasons "sufficiently serious to 'stigmatize' or otherwise burden the individual so that [s]he is not able to take advantage of other employment opportunities," and the public employer publicizes those stigmatizing charges, the employee's liberty interest under the Constitution is implicated and she must be given an opportunity to refute the charges. *Tibbetts v. Kulongoski*, 567 F.3d 529, 536 (9th Cir. 2009). To trigger this procedural guarantee, "an employee must show that (1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment." *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998) (per curiam) (internal quotation marks omitted). If an employee makes these showings, and was not provided "a 'name-clearing' hearing," the employee has been denied due process under the Fourteenth Amendment. *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004). This analysis applies to public probationary employees. *See Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 777 (9th Cir. 1982).

In order to establish the third prong, that "the charge is made in connection with termination of employment," *Mustafa*, 157 F.3d at 1179, a plaintiff must establish a "temporal nexus between the employer's statements and the termination," *Campanelli v. Bockrath*, 100 F.3d 1476, 1483 (9th Cir. 1996). We have avoided bright-line rules in determining whether this temporal nexus has been satisfied; the allegedly stigmatizing statements and the termination need not be simultaneous, but "the statements must be 'so closely related to discharge from employment'" that they are "'in the course of the [plaintiff's] termination.'" *Tibbetts*, 567 F.3d at 537 (quoting *Campanelli*, 100 F.3d at 1482). For example, we have held that stigmatizing statements made five days after a resignation were sufficiently close in time

"to make the resignation itself stigmatizing in the eyes of potential employers," *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 983 (9th Cir. 2002), while a period of sixteen months was "far too remote" to satisfy this temporal nexus requirement, *Tibbetts*, 567 F.3d at 538.

When considering whether a defendant is entitled to qualified immunity on a due process claim of the sort raised here, "we must evaluate whether it was clearly established" that the termination and allegedly stigmatizing statements were sufficiently close in time to satisfy the temporal nexus test. *Id.* at 537. In *Tibbetts*, we held that it was not clearly established that a government official's "stigmatizing statement made nineteen days" after the plaintiff's termination would satisfy this temporal nexus test, and therefore we concluded that the defendant was entitled to qualified immunity for failure to provide a name-clearing hearing. *Id.* at 538. Perez points to no decision after *Tibbetts* which has addressed this specific timing issue.

Perez alleges that Captain Moore's August 16, 2012 letter to Leah Begley, which informed her that the Department had sustained two charges against Perez and Begley, constituted the public disclosure of questionable and stigmatizing charges against her. She further argues that this public charge was made in connection with her termination on September 4, 2012. Because the Department did not give her a name-clearing hearing on the charges within that letter before deciding to terminate her, Perez alleges that she was deprived of her constitutional rights to due process.

This claim does not survive summary judgment. Even assuming that Perez could establish that the August 16, 2012 letter included stigmatizing charges against Perez that were both disputed and publicly disclosed, Perez has failed to show that it was clearly established that such charges were

"made in connection with [her] termination." *Mustafa*, 157 F.3d at 1179. The time period between the August 16th letter and the September 4th termination was nineteen days, the same period as in *Tibbetts*. Accordingly, we are bound by our precedent to conclude it was not clearly established that defendants were required to provide Perez with a name-clearing hearing, and defendants are therefore entitled to qualified immunity.[5]

## IV

Because it was not clearly established that the defendants violated Perez's constitutional rights, the defendants here are entitled to qualified immunity on each of Perez's claims. Therefore, the district court did not err in granting summary judgment in favor of defendants.

## V

The dissent argues that it is improper to "substitut[e] . . . a different judge following the post-publication death of the original decision's author" and to change a previously published opinion except as part of an en banc court decision. Dissent at 29.

We have already rejected this argument. *See Carver v. Lehman*, 558 F.3d 869 (9th Cir. 2009). *Carver* involved a situation almost identical to this one. A panel majority (Judges Ferguson and Reinhardt) filed an opinion over the dissent of Judge M. Smith. *Id.* at 880 (Reinhardt, J., concurring). Judge Ferguson died before the panel could rule on a petition for rehearing. *Id.* Pursuant to our rules,

---

[5] Because we decide this claim on the third *Mustafa* prong, we need not and do not reach the issue of whether the letter to Leah Begley was "stigmatizing."

*see* Ninth Circuit General Orders 3.2(h), Judge Tallman was drawn in his place. *See Carver*, 558 F.3d at 880 (Reinhardt, J., concurring). The new panel withdrew the prior opinion and replaced it with a substantially revised version. *See id.*

While conceding that Judge Smith and Judge Tallman had the authority to withdraw and replace the prior opinion, Judge Reinhardt argued that it was "unwise" to do so, because only the en banc process should be used to correct published decisions. *Id.* at 881 (Reinhardt, J., concurring). The *Carver* majority flatly rejected this argument, stating that "[u]ntil the mandate has issued, opinions can be, and regularly are, amended or withdrawn, by the merits panel at the request of the parties pursuant to a petition for panel rehearing, in response to an internal memorandum from another member of the court who believes that some part of the published opinion is in error, or *sua sponte* by the panel itself." *Id.* at 878–79. Panels likewise routinely withdraw and amend published opinions in response to an en banc call from a member of the court who believes there are errors in the opinion.[6] There is no support for the dissent's argument that a panel lacks authority to amend its opinion once an en banc call is made. Dissent at 31 n.2.[7] This "collaborative

---

[6] *See, e.g.*, *Sanchez v. Sessions*, 870 F.3d 901 (9th Cir. 2017), *withdrawn*, 895 F.3d 1101 (9th Cir. 2018), *and superseded*, 904 F.3d 643 (9th Cir. 2018). In *Sanchez*, an off-panel judge called the original panel opinion (authored by Judge Pregerson) en banc. Judge Pregerson died before the opinion mandated, and Judge Wardlaw was drawn to replace him. The new panel withdrew the opinion and issued a new one. *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018).

[7] The dissent's reliance on General Order 5.3(b) is misplaced. That rule provides that an off-panel judge can ask a panel to revise its opinion before an en banc call is made or before the time for calling for en banc rehearing expires. Ninth Circuit General Orders 5.3(b). It has no bearing on a panel's authority to amend its opinion in light of considerations raised during the en banc call process or otherwise.

process," *Carver* explained, "strengthens, not weakens, the final quality of those opinions, thereby better enabling them to stand the test of time, and engender the respect of thoughtful citizens for both the opinion, and the court that produced it." 558 F.3d at 879.

*Carver* is directly applicable here. At the time of Judge Reinhardt's death, the opinion filed by the prior panel was not final, because no mandate had issued. *See id.* at 878 ("No opinion of this circuit becomes final until the mandate issues."). A judge on this court called for en banc rehearing sua sponte, and, at the court's order, both parties briefed whether rehearing was warranted in this case. *See* Ninth Circuit General Orders 5.4(c)(3). Because "the opinion issued by the prior majority was only part way through its finalization process," *Carver*, 558 F.3d at 878, a replacement judge was drawn, *see* 28 U.S.C. § 46(b)–(d); *see also* Ninth Circuit General Orders 3.2(h), and en banc proceedings were suspended. As all three judges acknowledged in *Carver*, the new panel had the authority to reconsider and withdraw the opinion filed by the prior panel and to substitute a different opinion. *See* 558 F.3d at 879; *id.* at 880 (Reinhardt, J., concurring).

Like all three-judge panels, we must resolve the case before us to the best of our abilities, which may include reconsidering and revising an opinion that has not yet mandated. As is our practice, the parties (and any off-panel judge of our court) have the opportunity to request rehearing en banc of this opinion.

**AFFIRMED.**

MOLLOY, District Judge, dissenting:

I respectfully disagree with the new majority opinion in this case and consequently I dissent. There are two specific reasons that I dissent, one being that the majority in the published opinion in this case, *Perez v City of Roseville*, 882 F.3d 843 (9th Cir. 2018), correctly resolved the issues. The majority opinion of a quorum of judges should stand for the reasons stated therein.

The more problematic concern is the substitution of a different judge following the post-publication death of the original decision's author. Unlike the situation in *Yovino v. Rizo*, 139 S. Ct. 706 (2019) (per curiam), Judge Reinhardt's vote and his opinion in this case were published before his untimely death. More importantly an *en banc* call had been made before he died, a call that was not resolved before the judicial substitution. In *Yovino*, the Supreme Court recognized the appropriate procedure in such a situation by acknowledging the rules in this and other circuits: "Like other courts of appeals, the Ninth Circuit takes the position that a panel decision . . . can be overruled only by a decision of the en banc court or this Court." *Id.* at 708; *c.f. Miller v. Gammie*,[1] 335 F.3d 889, 892 (9th Cir. 2003) (en banc); *Naruto v. Slater*, 888 F.3d 418, 421 (9th Cir. 2018). The clear purpose of an *en banc* rehearing is to provide a procedural mechanism to correct the application of the law by a three-judge panel of the Circuit. Here, the substitution of a judge who legitimately disagrees with the original

---

[1] *Miller* talks directly about intervening Supreme Court or state supreme court authority but the principle invoked is the same. When a three-judge panel has published an opinion and a member of this Court has called for *en banc* consideration, it should only be the *en banc* panel that undoes a published opinion where a quorum of the panel was alive and well when the panel opinion was published.

opinion should not change the outcome except as part of an *en banc* court decision.

Ironically, Judge Reinhardt opined on this very issue when he wrote:

> In the case before us, it is not necessary for the new majority to undo the original majority's constitutional ruling, even if it disagrees with it. The constitutional question is a close one, and substantial arguments can be made for either position. Under these circumstances, the more important consideration, in my view, is maintaining the stability and legitimacy of the court's decisions. We have a procedure for correcting decisions that a majority of the court believes warrant reconsideration. That process is known as a [sic] en banc rehearing. It can be invoked if any single judge on the court, including either member of the majority, elects to make a call. Relying on this process would, in my view, be in the better interest of the court and the judicial system; increasing the extent to which judicial decisions depend on chance and subjectivity is not a wise alternative.

*Carver v. Lehman* 558 F.3d 869, 880–81 (9th Cir. 2009) (Reinhardt, J., concurring). The procedural facts in this case compel *en banc* consideration of whether Judge Reinhardt's majority opinion, an opinion I joined, should be allowed to stand or whether it should be reconsidered. As the Supreme Court noted in *Yovino*—the case involving Judge Reinhardt's death, "Under § 46(c), a court of appeals case

may be decided by a panel of three judges, and therefore on such a panel two judges constitute a quorum and are able to decide an appeal—provided, of course, that they agree." *Yovino*, 139 S. Ct. at 709. While it is true that judge substitution is an acceptable practice[2] and no rule or decision of this court makes a judge's votes and opinions immutable before their public release, once an opinion is published it should stand absent correction by the entire court acting through the *en banc* process. Such a procedure also gives the parties an opportunity to be fully heard before an opinion is reversed or altered.

The majority argues that the substitution process in this case complies with General Order 3.2(h) which provides for the substitution of a judge in the event of a panel member's death or unavailability when "the case is under submission." The majority's interpretation of that rule is far too capacious considering 28 U.S.C. § 46(d) as interpreted by the Supreme Court. Submission is the process by which the panel has received and reviewed the record, heard argument by the parties, and taken the matter under consideration for decision. *Cf.* 9th Cir. R. 25-4 (distinguishing among cases that have been scheduled for oral argument, argued, submitted, and decided). Deciding the case takes place when a quorum of two on the panel agrees to an appropriate disposition. *See Yovino*, 139 S. Ct. at 709. The majority's emphasis on the absence of a mandate misses the mark. Once the case is decided by a quorum of the panel judges it is no longer under submission. Because this case was not

---

[2] There may be a question here whether the reconstituted panel was even authorized to revisit the opinion given the *en banc* call. *Cf.* Gen. Or. 5.3(b) ("Any active or senior judge may, *before an en banc call is made* or before the time for calling for en banc expires, propose to the panel that it amend its disposition.") (emphasis added).

under submission when Judge Reinhardt died, General Order 3.2(h) is not applicable.

While procedural concerns alone counsel taking this case *en banc*, the substantive issues here may also warrant such review. Specifically, this Circuit's treatment of the right articulated in *Lawrence v. Texas* would benefit from an *en banc* panel's clarification. *See, e.g.*, *Erotic Serv. Provider v. Gascon*, 880 F.3d 450 (9th Cir. 2018); *Smithkline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471 (9th Cir. 2014); *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014); *Log Cabin Republicans v. United States*, 658 F.3d 1162 (9th Cir. 2011) (O'Scannlain, J., concurring); *In re Golinski*, 587 F.3d 901 (9th Cir. 2009). Indeed, in the fourteen months since the published opinion issued, this case has been cited 72 times, including at least twice for its substantive holding.

In this case Perez's appeal was decided by a quorum of the judges on the original panel, the decision was published, and there was an *en banc* call by a member of this court. Consequently, the original opinion should stand. It was decided. Now with a different judge assigned, the new majority opinion completely reverses the original opinion without notice to the parties or regard to the *en banc* call. Judge Reinhardt's death under the circumstances presented in this case should not be invoked to reverse the outcome of the case legitimately decided by the original majority through a procedural mechanism of substituting a different judge. There is no need for a substitution when the majority decided and published the opinion questioned here. To do so, would be "somehow unseemly . . . when the reason for the change is the death of a member of the prior majority." *Carver*, 558 F.3d at 878. It may also be a violation of the Supreme Court's view of 28 U.S.C. § 46(c) and (d). *See Yovino*, 139 S. Ct. at 709. A published quorum opinion is

not under submission; it is final, except if the entire court corrects it *en banc.* For these reasons, I respectfully dissent and believe this case should go to an *en banc* panel if the previously published opinion is in error, which I do not believe it is.